```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
                                                               **FOR FULL PUBLICATION**
Maria BASOVA and Andrei BASOV;
Muhammad T. ISLAM; Emilia PAULOVA
and Miroslav ARENDAC; Lukas PAULO;
Irena SAFONOVA and Andrey SMIRNOV;
Dorota KRUPSKA; Iwona SNIADOWSKI;
Zdzislaw GORCZOWSKI and Renata
GORCZOWSKI; Mohammed RAHMAN,
Rokeya RAHMAN, Sharmin RAHMAN,
Zinia RAHMAN and Ashrafur RAHMAN;
Mohmmad HAQ and Nurjahan BEGUM;
Leszek PIETRZAK; Nina ANICHINA and      MEMORANDUM
Timour TEMINDAROV; and Mingma          AND ORDER
SHERPA,

                   Plaintiffs,          Civil Action No.
                                        CV-03-4929 (DGT)
        - against -

John ASHCROFT, Attorney General;
UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES, Eduardo
AGUIRRE, Director, United States
Citizenship & Immigration
Services; Mary Ann GARTNER,
District Director, New York
District Office, United States
Citizenship and Immigration
Services; Colin POWELL, Secretary
of State; DEPARTMENT OF STATE;
FEDERAL BUREAU OF INVESTIGATIONS;
CENTRAL INTELLIGENCE AGENCY; and
the UNITED STATES OF AMERICA,

                   Defendants.
----------------------------------------------------------- x
```

TRAGER, J.

Plaintiffs in this action were selected as candidates for the 2003 Diversity Immigrant Visa Lottery ("2003 DV") program. They allege that their applications for adjustment of status were denied because defendants – the New York District Office of the

United States Citizenship & Immigration Services (the "Bureau of Citizenship & Immigration Services");[1] the Department of State ("State Department"); the Federal Bureau of Investigation ("FBI"); and the Central Intelligence Agency ("CIA") – failed to timely process their applications.  They bring this action to compel defendants to grant their requests for visas and accompanying adjustments of status.  Defendants have moved to dismiss.

**Background**

**(1)**

The "diversity visa" program was instituted in 1990 to facilitate immigration by individuals from countries with historically low rates of immigration to the United States.  <u>See generally</u> 8 U.S.C. § 1153(c)(1).  Each year, 100,000 candidates, selected from a pool of millions, receive the right to apply for one of 55,000 diversity visas allocated by the State Department.  The State Department selects 100,000 candidates "to ensure, to

---

[1] Under the Homeland Security Act of 2002, Pub.L. 107-296 § 441, 116 Stat. 2135, 2193 (2002), 6 U.S.C. §§ 202(3) and 251, on March 1, 2003, the Immigration and Naturalization Service ("INS") has been abolished, with its functions transferred to the Department of Homeland Security.  United States Immigration and Customs Enforcement ("ICE"), a bureau within the Department of Homeland Security, now bears responsibility for enforcing the immigration laws. See generally I.C.E. Press Office, U.S. Dep't of Homeland Security, Fact Sheet, Immigration and Customs Enforcement (ICE) (Oct. 6, 2004), available at http://www.ice.gov/graphics/news/factsheets/index.htm.

the extent possible, usage of all immigrant visas authorized." 22 C.F.R. § 42.33(c). Thus, the 100,000 candidates are not automatically guaranteed a visa; rather, they enjoy only the right to apply for a visa, which, if granted, qualifies them for an adjustment of status and, accordingly, the opportunity to become a lawful permanent resident. Spouses and children of lottery winners may submit derivative applications for diversity visas as well. 8 U.S.C. § 1153(d).

The State Department administers the diversity visa program. The Bureau of Citizenship & Immigration Services adjudicates diversity visa applicants for those applicants living within the United States at the time of their selection. The application process requires the completion of numerous forms, the submission of fingerprints and an interview, as well as background checks by the FBI and CIA. In order for an applicant to receive a visa, his or her application must be granted before midnight on the last day of the relevant fiscal year. 8 U.S.C. § 1154(a)(1)(I)(ii)(II); 8 C.F.R. §§ 42.33(a)(1), (d), (f). That deadline, September 30, represents a crucial cut-off date in the litigation surrounding the DV program.

Plaintiffs allege that they were selected from the initial lottery, were eligible to receive an adjustment of immigration status after promptly filing applications for visas and adjustments of status, but were denied visas and adjustments of

3

status due to delay by the various defendant agencies. In all cases, plaintiffs were notified after the September 30 deadline that no visas could be issued after that date and, as a consequence, their applications would be denied.

### (2)

This action was brought in two waves. On September 26, 2003, four days before the close of the statutory period, two of the plaintiffs in this action, Maria Basova and Andrei Basov (the "Basova plaintiffs"), brought an initial action to compel defendants to process their applications before the September 30, 2003 fiscal year deadline. They alleged that they were selected from the DV lottery and that they promptly filed applications for adjustment of status. The applications were accepted for filing by the New York District Office of the Bureau of Citizenship & Immigration Services, which cashed their filing fees and began processing their applications. In a letter dated May 1, 2003, the Basova plaintiffs were notified that they would be interviewed for their adjustment applications at 10:30 am on June 4, 2003. During the interview, they were told that their fingerprint check had cleared the FBI but that their security clearances were still pending and their application could not be approved until those checks were complete. The Basova plaintiffs, through prior counsel, continued to inquire into the status of their applications. They also submitted a request

under the Freedom of Information Act ("FOIA") for information regarding the dates their name checks were initiated and cleared.

On February 23, 2004, an amended complaint was filed, adding additional individuals who had applied for principal or derivative applications for adjustment of status: Nina Anichina, Miroslav Arendac, Nurjahan Begum, Renata Gorczowski, Zdzislaw Gorczowski, Mohmmad Haq, Muhammad T. Islam, Dorota Krupska, Lukas Paulo, Emilia Paulova, Leszek Pietrzak, Ashrafur Rahman, Mohammed Rahman, Rokeya Rahman, Sharmin Rahman, Zinia Rahman, Irena Safonova, Mingma Sherpa, Andrey Smirnov, Iwona Sniadowski, and Timour Temindarov. These plaintiffs, not unlike the Basova plaintiffs, filed applications on time, received notifications of an interview and provided fingerprint information. However, their applications were denied because their cases could not be approved by the September 30, 2003 cut-off date or because, they were told, no remaining visas were available.

(3)

Hearings before this court took place immediately before and after the September 30, 2003, statutory deadline for the FY 2003 year. During those hearings, defendants were directed to inquire into the status of the Basova plaintiffs' background checks.[2] Defendants attempted to coordinate the clearing of the background

---

[2]At that time, this action was heard in tandem with another matter, Simaite v. BCIS, 03-cv-4928, which the parties were able to resolve.

checks and place the Basova plaintiffs on any available wait lists for visas. However, in a letter dated September 29, 2003, defendants represented to the court that, although plaintiffs' background checks had cleared, no more visas were available under the DV 2003 program because all had been used up. See Appendix of Exhibits to Plaintiffs' Memorandum of Law ("Pl. Ex.") A. Defendants also furnished a declaration from Charles W. Oppenheim, a consular officer at the State Department, which confirmed defendants' representation that no visas remained. See Pl. Ex. B ("At this time 50,000 DV numbers have been used. . . . No waiting list can be established this year, because there is no expectation that unused numbers will become available for allocation before the end of the fiscal year."). Although it appears that the Bureau of Citizenship & Immigration Services agreed to place the Basova plaintiffs on a temporary wait list, the State Department refused to create one, making it unclear what effect, if any, the Bureau of Citizenship & Immigration Services wait list would have. In any event, the wait list was scheduled to expire at midnight on September 30, 2003, the very same day the list was created. See Pl. Ex. B (Memorandum from Ronald A. Atkinson, Section Chief, Adjustment of Status Unit, U.S. Dep't of Homeland Security dated September 30, 2003).

Although defendants claim that no visas remain for the 2003 program, plaintiffs cite government statistics showing that less

6

than 50,000 visas were actually issued that year.  See Pl. Ex. C
(Yearbook of Immigration Statistics) (indicating that only 46,347
visas were used for 2003); see also Pl. Ex. D. (FY-2003 Diversity
Visa Statistical and Trend Analysis) (48,115 visas used for
2003).[3]  Consequently, they argue that visas remained available
from the 2003 program and that defendants' contrary
representations made to this court were inaccurate.  The Basova
plaintiffs also cite documents provided by the FBI in response to
their FOIA request, which demonstrate that their security
clearances were not actually sought from the FBI until September
29, 2003 – one day before the close of the statutory period –
even though their interview had taken place in June and the FBI
fingerprint check had cleared prior to that interview.  This
lends credence to the Basova plaintiffs' argument that their
applications were held up because of bureaucratic delays, and
possibly ineptitude, on the part of the defendant agencies.

**Discussion**

Defendants seek to dismiss the amended complaint upon
numerous grounds.  Their chief arguments for dismissal are as

---

[3]There is also a question whether, assuming all 50,000 DV visas were issued, remaining visas might be available from the group of 5,000 visas for use pursuant to the Nicaraguan and Central American Relief Act ("NICARA").  Because plaintiffs' statistics indicate that all visas were not released from the batch of 50,000, the NICARA visa issue need not be explored.

follows: (1) Congress has specifically stripped district courts of jurisdiction to review diversity visa claims; (2) plaintiffs failed to exhaust administrative remedies; and (3) plaintiffs' claims are moot.

**(1)**

**Jurisdiction**

The government argues that 8 U.S.C. § 242(a)(2)(B)(i) of the Immigration and Nationality Act ("INA") bars review of any judgment concerning plaintiffs' adjustment applications. However, courts have repeatedly held that the statutory bar to jurisdiction at 8 U.S.C. § 242(a)(2)(B)(i) only precludes review of discretionary determinations to grant or deny relief, not nondiscretionary matters or purely legal questions concerning relief. Sepulveda v. Gonzales, 407 F.3d 59, 62-64 (2d Cir. 2005).

The Seventh Circuit has rejected the defendants' position that Section 242(a)(2)(B)(I) strips federal jurisdiction over adjustment-of-status cases in which "the 'denial' of the applications was not a decision on the merits." Iddir v. INS, 301 F.3d 492, 497 (7th Cir. 1999) (jurisdiction-stripping provision "only bars review of actual discretionary decisions to grant or deny relief under the enumerated sections"). See Paunescu v. INS, 76 F.Supp.2d 896, 900 (N.D. Ill. 1999) ("Because plaintiffs have neither been denied or granted relief, [the provision] does not bar jurisdiction."). See also Kim v.

Ashcroft, 340 F.Supp.2d 384, 389 (S.D.N.Y. 2004) ("[w]hether to adjudicate an adjustment application is not discretionary") (emphasis in original).

The case law clearly establishes that the jurisdictional bar does not apply in cases such as this one, where relief was denied purely because of delay or inaction. Consequently, the defendants' position with respect to the jurisdictional bar is rejected.

**(2)**

**Exhaustion of Administrative Remedies**

Defendants' exhaustion arguments are equally unavailing. Preliminarily, this case is not governed by Howell v. INS, 72 F.3d 288, 291 (2d Cir. 1995), because the prerequisites for finding an exhaustion requirement – the presence of statutory language containing an exhaustion requirement or an administrative scheme providing for agency relief – are not present. Indeed, there appears to be no meaningful administrative scheme available to plaintiffs. See Howell, 72 F.3d at 293 & n. 5 (deliberately leaving open the question whether district courts possess subject matter jurisdiction to review a district director's denial of adjustment of status when removal proceedings have not been commenced).

Defendants' argument regarding exhaustion would have more weight if this case involved the denial of a visa application in the context of a removal proceeding. Under such circumstances,

the individual seeking to adjust status would have available certain administrative remedies, for example, the right to review an application before an immigration judge. Such remedies are not available here, and, consequently, defendants' exhaustion argument must be rejected.[4]

**(3)**

**Mootness**

Defendants also argue, here with some plausibility, that this case is moot because all visas for the FY 2003 year have been given out, and therefore none are available. They also argue, again, plausibly, that under the statute, no visas can be issued after midnight on September 30, the last day of the DV program for a given fiscal year. Plaintiffs have already raised

---

[4] As observed by one of my colleagues, it would be nothing short of "troubling" in cases like this if a plaintiff's only avenue for relief would arise if, and only if, removal proceedings were commenced. See Minkina v. Ashcroft, No. 01 CV 0511 (SJ), 2004 WL 1242525 (E.D.N.Y. May 27, 2004) (Johnson, J.) Unless and until the agencies institute removal proceedings, it is hard to see how defendants can maintain that regulations "provide[ plaintiffs] with the right to renew their adjustment applications in removal proceedings." Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Complaint ("Def. Mem.") at 13. Moreover, even in such proceedings, plaintiffs' applications might be denied on timeliness grounds as well. See Coraggioso v. Ashcroft, 355 F.3d 730, 734-35 (3d Cir. 2004) (concluding "with regret" that alien facing deportation who could not be granted an adjustment of status because those removal proceedings were instituted after the close of the statutory deadline for the given fiscal DV year). For all these reasons, it is understandable why plaintiffs would cast the government's claimed remedies as "little more than an exercise in futility that can provide the Plaintiffs with no relief, while effectively destroying any opportunity for later judicial review." Pl. Br. at 2.

serious doubts as to the accuracy of defendants' former point, as the statistics they cite, see infra, strongly suggest that all visas were not issued for the particular year in which they sought adjustment of status.[5]

With respect to the latter issue, although a number of courts have noted that the statutory language of the diversity visa program does not allow the issuance of a diversity visa after the end of a fiscal year, it would appear that all but one such cases involved claims brought by plaintiffs after the close of the statutory period for the year in which they applied for a diversity visa. See Coraggioso, 355 F.3d at 734 n. 8 (noting that relief was sought in district court after "the expiration of the 1998 fiscal year"). See also Ahmed v. Dept. of Homeland Security, 328 F.3d 383, 385 (7th Cir. 2003); Nyaga v. Ashcroft, 323 F.3d 906, 907 (11th Cir. 2003); Iddir, 301 F.3d at 501. Because at least two of the plaintiffs in this action initiated suits before that period, those claims must be analyzed under a different rubric.

a.   **Basova Plaintiffs**

The Basova plaintiffs brought their claim in district court on September 26, 2003, roughly four days before the expiration of the statutory deadline. This is no minor detail, and it

---

[5] Defendants do not appear to challenge the accuracy of these statistics, and at this time those numbers, taken from government statistical reports, must be taken to be true.

distinguishes their claims from cases in which courts have barred relief for plaintiffs who initiated actions after the September 30 deadline. The parties appeared before this court in extensive hearings on the Basova plaintiffs' claims and pursued good-faith efforts to resolve this matter. Although the parties were able to resolve the <u>Simaite</u> matter, <u>see</u> <u>supra</u> at footnote 3, they were not able to bring the Basova plaintiffs' claims to a successful resolution. When it became clear – after the statutory period closed – that defendants could not keep the plaintiffs on any type of wait list, this case moved to a briefing schedule on the instant motion.

At this point, there is serious doubt as to the number of visas that were issued for FY 2003, and the doubt generated by those statistical reports is sufficient to rebut defendants' arguments on their motion to dismiss.[6]

Defendants contend that "there was no order compelling the

---

[6] Defendants contend that plaintiffs' case "devolves into a demand that the Bureau of Citizenship & Immigration Services, in purported fairness, and notwithstanding numerous random components of the diversity visa issuing process, treat the applications on a 'first-come, first-served' basis, by depriving other eligible and properly-filing diversity visa recipients of adjustment so that Plaintiffs may adjust in their stead." Def. Mem. at 10. Such a statement somehow implies that, owing to plaintiffs' litigation strategy, other, equally (or perhaps more) deserving candidates will be cut out of the picture. But, given the evidence showing that not all 50,000 DV visas were issued in FY 2003, and given defendants' assertion that they are not going to award any additional FY 2003 visas at this time, there appears little logic behind the assertion that plaintiffs' gain implies others' loss.

government to issue DV visas to plaintiffs prior to the expiration of the fiscal year.  Accordingly, plaintiffs are not entitled to any relief, and their case should be dismissed as moot."  Defendants' Reply Memorandum of Law at 6.  If by "order," the government refers to entry of a final order directing the processing of the Basova plaintiffs' applications, that is essentially what took place during the initial proceedings, when the agency was directed to complete the processing of the applications and grant visas, assuming their availability.  To require something more formal, as defendants seem to do, takes an overly restrictive meaning of "order" and dilutes the effect of my earlier directive.  Furthermore, it discourages the type of good-faith attempts made by both parties to settle the issue in advance of briefing, which should under no circumstance prejudice the Basova plaintiffs.  In any event, the fact that the Basova plaintiffs instituted this action before the talismanic September 30 deadline renders defendants' mootness arguments invalid.

A contrary ruling could make it extremely difficult for district judges to adjudicate cases like the one at bar.  After all, the timing of these suits is inescapably hurried, as plaintiffs generally bring them only a few days before the close of the statutory period so as not to interfere with the agency's determination of the DV application, which could be imminent.  Thus, district courts tend to lack all the information necessary to adjudicate the issue at the initial hearing.  If judges were

required to act prior to the statutory deadline in a way advanced by the government, they might be inclined to go too far, directing action before the parties were granted an opportunity to resolve the matter through their own devices. Under such circumstances, the deliberative process would be aborted and the court would be forced to rush to judgment. Such a system of rash decision-making would be perverse indeed.

Although a number of courts have dismissed actions for adjustment of status by plaintiffs who filed their claims after the statutory deadline, those rulings specifically reserve judgment – and imply a contrary holding – for cases instituted prior to that deadline. See Coraggioso, 355 F.3d at 734 & n.8 (3d Cir. 2004) ("Had Coraggioso sought relief prior to the expiration of the 1998 fiscal year, our analysis may have been different."). Other cases, not inconsistent with the Coraggioso holding, imply that the court would need to take some form of action to retain jurisdiction. See Ahmed v. Dept. of Homeland Security, 328 F.3d 383, 387 (7th Cir. 2003) ("Both the majority and the concurring opinion [in Iddir] recognized that the case would have been different if it had been filed before the end of the visa year, while the INS still had statutory authority to issue the visa, and if the district court had acted within that time period."); Iddir, 301 F.3d at 501 & n.2 ("It would be a different case had the district court ordered the INS to adjudicate the appellants' status while the INS maintained the

statutory authority to issue the visas. . . . In such a situation, the INS would be on notice to reserve visas and must complete the task, as ordered, before time expires.") (internal citations omitted); Paunescu, 76 F.Supp.2d 896 at 902. Only Zapata v. INS, 93 F.Supp.2d 355 (S.D.N.Y. 2000) (Mukasey, J.), a case decided before the stream of circuit-court decisions cited above, involved a dismissal on mootness grounds of an action filed before expiration of statutory period.[7]

A recent case in this District before Judge Gershon, which involved a claim for adjustment of status very similar to the case at bar, supports the Basova plaintiffs as well. In Przhebelskaya v. U.S. Bureau of Citizenship and Immigration Services, 338 F.Supp.2d 399 (E.D.N.Y. 2004), plaintiffs came into court shortly before the expiration of the statutory deadline and sought to compel the agency to adjust their status by the end of the statutory period. Judge Gershon issued an order before the statutory deadline compelling defendants to process the applications. 338 F.Supp.2d at 400. After the defendants failed to process all the applications in a timely manner, the plaintiffs returned to court – this time, after the expiration of the statutory deadline – to compel the government to adjust the status of certain plaintiffs whose applications still had not

---

[7] However, it should be noted that then-Judge Mukasey gave plaintiffs an opportunity to respond to additional briefing on the mootness issue, but their counsel never availed themselves of this opportunity. See Zapata, 93 F.Supp.2d at 357.

been processed.  Judge Gershon ordered the government to grant the applications and adjust the status of those remaining plaintiffs, and relied on her prior order in that case, issued before the September 30 deadline, as a basis for maintaining mandamus jurisdiction over the case.  She held that "[t]he existence of a prior order to compel is the dispositive factor in a case such as this one."  Id. at 404 n. 6.

The Basova plaintiffs brought a timely action challenging the actions of the various agencies charged with carrying out the terms of the DV statute.  Whatever "fatal mistake" a DV plaintiff makes by failing to "arrang[e] immediately for a lawsuit to be brought on her behalf . . . prior to September 30," Ahmed, 328 F.3d at 385, the Basova plaintiffs avoided such a mistake by taking affirmative steps before the deadline approached.  Their proactive decision should redound to their benefit.  Moreover, defendants have "a non-discretionary duty to issue a decision on the plaintiffs' applications within a reasonable time." Paunescu, 76 F.Supp.2d at 901 (citing cases).  Defendants' arguments are insufficient to support their motion to dismiss the Basova plaintiffs' claim, and, therefore, the motion is denied with respect to those plaintiffs.

**b.   The Remaining Plaintiffs**

Although the defendants' motion to dismiss the Basova plaintiffs' claims must be rejected, the opposite must be the outcome for those plaintiffs whose names appeared for the first

16

time on the amended complaint, filed on February 23, 2004, months after the statutory deadline. The question whether these additional plaintiffs' claims can go forward is analogous to the question whether an amended complaint naming new plaintiffs after expiration of a given statute of limitation can be said to "relate back" to the original proceeding, a question governed by Federal Rule of Civil Procedure 15.

Rule 15(c)(3) lays out the specific requirements governing amended pleadings that would "change[] the party or the naming of the party against whom the claim is asserted. . . ." Rule 15(c)(3). While the rule on its face applies only to the naming of new defendants, courts have extended the rule to govern amendments adding new plaintiffs as well. See, e.g., Nelson v. County of Allegheny, 60 F.3d 1010, 1014 (3d Cir. 1995), cert. denied, 516 U.S. 1173 (1996); In re Bausch & Lomb, Inc. Sec. Litig., 941 F.Supp. 1352, 1363 (W.D.N.Y. 1996).

In determining whether the newly-added parties relate back to the prior proceeding, the court assesses whether defendants "(A) received such notice that they will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought with the original claims." Nelson, 60 F.3d at 1014. As far as the first prong is concerned, the naming of new plaintiffs could indeed prejudice the defendants. Although plaintiffs essentially

17

"allege injury by the same conduct described in the original pleading," see id. at 1015, the evidence relevant to a defense against these new claims would require substantial additional work by defendants, who would have to reconstruct the various paper trails for the individuals appearing for the first time in the new action.

The new complaint also fails the second prong as well. Defendants did not, nor should they have, known that, but for a mistake regarding a party's identity, the action by the additional plaintiffs would have been brought along with the original claims.

Because the amended complaint does not relate back to the original, pre-deadline filing, the newly-added plaintiffs must be treated the same as any new plaintiffs instituting an action after the close of a given statutory deadline. Here, that deadline is imposed by provisions governing the DV statute itself, which make clear that applicants are eligible to receive visas "only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). With respect to claims initiated after the September 30 deadline, the case law outlined supra clearly holds that such cases must be dismissed. Accordingly, defendants' motion is granted with respect to those plaintiffs named for the first time in the amended complaint.

## Conclusion

Defendants' motion to dismiss the action is denied with respect to plaintiffs Maria Basova and Andrei Basov, and granted with respect to all other plaintiffs.

Dated:  Brooklyn, New York
        June 22, 2005

SO ORDERED:


_____/s/_____
David G. Trager
United States District Judge

SENT TO:

Scott Dunn
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza
Brooklyn, NY 11201

Michael P. DiRaimondo, Esq.
DiRaimondo & Masi, LLP
401 Broadhollow Road, Suite 302
Melville, NY 11747